[Nos. 53825–5, 53859–0.   En Banc.   May 12, 1988.]

THE CITY OF SEATTLE, *Respondent,* v. TERESE
MESIANI, ET AL, *Petitioners.*

C. STEVEN FURY, ET AL, *Petitioners,* v. THE CITY
OF SEATTLE, ET AL, *Respondents.*

*Kenneth S. Kagan,* for petitioners Guidash, et al.

*Thomas B. Nast,* for petitioners Mesiani, et al.

*Dan W. Kilpatric* and *Davidson, Czeisler & Kilpatric,* for petitioners Fury, et al.

*Douglas N. Jewett, City Attorney,* and *Douglas B. Whalley* and *Terrence J. Cullen, Assistants,* for respondent.

UTTER, J.—Petitioners in this consolidated appeal challenge the constitutionality of a sobriety checkpoint program established by the Seattle Police Department during the holiday season of 1983–84. Terese Mesiani represents a group of defendants charged with criminal violations after being stopped at sobriety checkpoints. C. Steven Fury represents a group of plaintiffs routinely stopped at the sobriety checkpoints without individualized suspicion or probable cause. In both cases the trial court found the sobriety checkpoints violated article 1, section 7 of the Washington Constitution, but the Court of Appeals reversed, holding the checkpoints violated neither the fourth amendment to the United States Constitution nor article 1, section 7. *Fury v. Seattle,* 46 Wn. App. 110, 730 P.2d 62 (1986). We reverse.

The facts surrounding the establishment and execution of Seattle's sobriety checkpoint program are set out in the decision of the Court of Appeals, 46 Wn. App. at 112. Police officers at the checkpoints stopped all oncoming motorists without warrants or individualized suspicion of any criminal activity. The locations and times for the checkpoints were designed to stop or deter the maximum

number of intoxicated drivers, giving due consideration to the safety and convenience of drivers. The drivers were asked to show their licenses to give the officers time to observe evidence of intoxication, such as fumbling. Less than 1 percent of the stops resulted in DWI arrests.

## ARTICLE 1, SECTION 7

■ When parties allege violation of rights under both the United States and Washington Constitutions, this court will first independently interpret and apply the Washington Constitution in order, among other concerns, to develop a body of independent jurisprudence, and because consideration of the United States Constitution first would be premature. *State v. Coe,* 101 Wn.2d 364, 373–74, 679 P.2d 353 (1984). We find the sobriety checkpoint program illegal based on adequate and independent state grounds. Any federal cases cited are used only for the purpose of guidance and do not by themselves compel the result reached.

Const. art. 1, § 7 provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The textual language of article 1, section 7 provides greater protection to individual privacy interests than the Fourth Amendment. *State v. Gunwall,* 106 Wn.2d 54, 65, 720 P.2d 808 (1986); *State v. Stroud,* 106 Wn.2d 144, 148–52, 720 P.2d 436 (1986); *State v. Myrick,* 102 Wn.2d 506, 510, 688 P.2d 151 (1984). Article 1, section 7 protects against warrantless searches and seizures, with no express limitations. *State v. Simpson,* 95 Wn.2d 170, 178, 622 P.2d 1199 (1980).

■ The City asserts that the State's interest in the legal operation of automobiles defeats any privacy interest under article 1, section 7. While we acknowledge the State's strong interest in assuring all drivers comply with applicable laws, the City's position is without support in either our cases or the language or logic of our constitution. From the earliest days of the automobile in this state, this court has

acknowledged the privacy interest of individuals and objects in automobiles. *State v. Gibbons,* 118 Wash. 171, 187, 203 P. 390 (1922); *see State v. Simpson,* 95 Wn.2d 170, 622 P.2d 1199 (1980); *see also State v. Marchand,* 104 Wn.2d 434, 706 P.2d 225 (1985) (applying the Fourth Amendment). We agree with the observations of the United States Supreme Court in *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979):

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. . . .

(Footnote omitted.) *Prouse,* at 662–63. Sobriety checkpoint stops are searches and seizures under article 1, section 7.

■ Because sobriety checkpoints involve seizures, they are valid only if there is "authority of law." Article 1, section 7 "unlike any provision in the federal constitution, explicitly protects the privacy rights of Washington citizens, *State v. White,* 97 Wn.2d 92, 110, 640 P.2d 1061 (1982), and these privacy rights include the freedom from warrantless searches absent special circumstances." *Stroud,* at 148. This court recognizes only narrow exceptions to the warrant requirement. *Jacobsen v. Seattle,* 98 Wn.2d 668, 672, 658 P.2d 653 (1983). Warrantless searches incident to arrests have been allowed, for instance, to prevent destruction of evidence or danger to officers. *Stroud,* at 152. The burden is on the City to show that the stop falls within an exception to the warrant requirement. *State v. Williams,*

102 Wn.2d 733, 736, 689 P.2d 1065 (1984). It has failed to do so.[1]

No argument has been presented to this court that would bring the checkpoint program within any possible interpretation of the constitutionally required "authority of law." The Seattle sobriety checkpoint program therefore violated petitioners' rights under article 1, section 7.

## FOURTH AMENDMENT

Although we dispose of this case on the basis of article 1, section 7, we analyze the Fourth Amendment because that was the basis of the Court of Appeals decision and because our reasoning may assist other courts who do not have state constitutional provisions similar to ours. *See State v. Coe,* 101 Wn.2d 364, 679 P.2d 353 (1984). We believe the federal constitution does not allow roadblocks based upon the evidence presented to the trial courts in these cases.

In *State v. Marchand,* 104 Wn.2d 434, 706 P.2d 225 (1985), this court found a "spot check" for drivers' licenses, auto registration and equipment to violate the Fourth Amendment, in part because there was no statutory constraint on the discretion of the police. The sobriety checkpoints here not only lack statutory constraints, but the invasion of the privacy interests of drivers was substantially greater than in *Marchand.* A seizure to discover evidence of crimes is more "hostile" than an administrative search. *Camara v. Municipal Court,* 387 U.S. 523, 530, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). Moreover, sobriety checkpoints are highly intrusive subjectively because the officer personally searches the driver for evidence of intoxication, including smelling breath, looking for open containers, and attempting to elicit evidence of lack of dexterity by asking

---

[1]The City argues that the sobriety checkpoints resemble the warrantless searches permitted by the Court of Appeals in *State v. Silvernail,* 25 Wn. App. 185, 605 P.2d 1279, *cert. denied,* 449 U.S. 843 (1980). However, *Silvernail* was expressly limited to situations in which there was reliable information that a serious felony had recently been committed. *Silvernail,* at 190, citing 3 W. LaFave, *Search and Seizure* § 9.5(a), at 141–44 (1978). This is far different from an inference from statistics that there are inebriated drivers in the area.

for a license. Comment, *DUI Roadblocks: Drunk Drivers Take a Toll on the Fourth Amendment*, 19 J. Mar. L. Rev. 983, 998 (1986); Comment, *The Constitutionality of Drunk Driving Roadblocks*, 58 U. Colo. L. Rev. 109, 119–20 (1986–1987). Seattle's sobriety checkpoint program unconstitutionally gave police officers unbridled discretion to conduct intrusive searches.

Other jurisdictions have applied, with differing results, the 3–prong balancing test of *Brown v. Texas*, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979) to determine whether sobriety checkpoints violate the Fourth Amendment. *E.g., State v. Superior Court*, 143 Ariz. 45, 691 P.2d 1073 (1984); *State v. Smith*, 674 P.2d 562 (Okla. Crim. App. 1984). "Consideration of the constitutionality of . . . seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown*, at 50–51.

This court takes judicial notice "there is no denying the fact that there is a very strong societal interest in dealing effectively with the problem of drunken driving." 4 W. LaFave, *Search and Seizure* § 10.8(d), at 71 (2d ed. 1987). Nevertheless, the City has offered little assistance in balancing interests because it attempts to weigh the national carnage of drunk driving year round against the minimal intrusion on Seattle drivers for a few seconds each. "The easiest and most common fallacy in 'balancing' is to place on one side the entire, cumulated 'interest' represented by the state's policy and compare it with one individual's interest in freedom from the specific intrusion on the other side . . ." *State v. Tourtillott*, 289 Or. 845, 881, 618 P.2d 423 (1980) (Linde, J., dissenting). A fairer balance would weigh the actual expected alleviation of the social ill against the cumulated interests invaded. Moreover, the City has failed to demonstrate the need for sobriety checkpoints or that less intrusive alternatives could not achieve most of the constitutionally permissible benefits sought, such as the addition of more officers to its special enforcement unit.

*See United States v. Martinez–Fuerte,* 428 U.S. 543, 562, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976); *People v. Bartley,* 125 Ill. App. 3d 575, 466 N.E.2d 346 (1984); Jacobs & Strossen, *Mass Investigations Without Individualized Suspicion: A Constitutional and Policy Critique of Drunk Driving Roadblocks,* 18 U.C.D. L. Rev. 595, 638–49 (1985). The checkpoint program fails a Fourth Amendment balancing test.

## CONCLUSION

The sobriety checkpoints violated the right to not be disturbed in one's private affairs guaranteed by article 1, section 7 and the fourth amendment to the United States Constitution. We reverse.

PEARSON, C.J., BRACHTENBACH, DORE, and CALLOW, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DOLLIVER, J. (concurring)—While I agree with the holding of the majority that the sobriety checkpoint program of the City of Seattle did not meet constitutional muster, I do so with reluctance since I believe a sobriety checkpoint program, properly authorized by statute or ordinance, could be designed which would violate neither Const. art. 1, § 7, nor the Fourth Amendment. The analysis of the majority sweeps far too broadly and, I fear, would find invalid any legislation which would authorize a sobriety checkpoint program. Thus, I write this concurrence.

## I

Aside from dicta in *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979), the Supreme Court has not considered the constitutionality of any sobriety checkpoints. While the Court has consistently held stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment, no matter how brief the resulting detention, *Delaware v. Prouse, supra* at 653; *United States v. Martinez–Fuerte,* 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976);

*United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975), it has also recognized such warrantless searches and seizures, less intrusive than a traditional arrest, as constitutional if the particular governmental invasion is reasonable under the circumstances. *United States v. Sharpe,* 470 U.S. 675, 682, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985); *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977); *Terry v. Ohio,* 392 U.S. 1, 20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). As noted by the majority, the reasonableness is determined by the 3–prong balancing test in *Brown v. Texas,* 443 U.S. 47, 51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979).

The *Brown* Court, while willing to recognize some legitimate interests of society to seize an individual, would not allow arbitrary invasions at the unfettered discretion of officers in the field. The Court did, however, lay the groundwork in support of a properly regulated and authorized sobriety checkpoint. "[T]he seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown,* at 51. Earlier, in *Delaware v. Prouse, supra* at 663, the Court stated its ruling invalidating a motor vehicle stop did "not preclude . . . States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." To avoid arbitrary and intrusive roving patrols, *see United States v. Brignoni–Ponce, supra* at 882, the Court in *Delaware v. Prouse, supra* at 663, suggested questioning of *all* oncoming traffic at a roadblock–type stop. This approach has been adopted in decisions governing border checks, *United States v. Martinez–Fuerte, supra;* vehicle license and registration checks, *United States v. Croft,* 429 F.2d 884 (10th Cir. 1970); and customs' inspections of vessels, *United States v. Villamonte–Marquez,* 462 U.S. 579, 77 L. Ed. 2d 22, 103 S. Ct. 2573 (1983). Likewise, several state courts have rendered decisions which uphold the constitutionality of sobriety checkpoints. *See Ingersoll v. Palmer,* ___ Cal. 3d ___,

743 P.2d 1299, 241 Cal. Rptr. 42 (1987); *People v. Bartley,* 109 Ill. 2d 273, 486 N.E.2d 880 (1985); *State v. Martin,* 145 Vt. 562, 496 A.2d 442 (1985); *Lowe v. Commonwealth,* 230 Va. 346, 337 S.E.2d 273 (1985); *People v. Scott,* 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984); *State v. Superior Court,* 143 Ariz. 45, 691 P.2d 1073 (1984); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983).

## II

Although the precise contours of the phrase "without authority of law" in Const. art. 1, § 7 have yet to be determined by this court, I agree with the majority that the Seattle police were acting "without authority of law" as required by Const. art. 1, § 7. However, the majority's remaining arguments need to be examined.

In *Ingersoll v. Palmer, supra,* and other courts upholding sobriety checkpoints, a balancing test from *Brown v. Texas, supra,* is used to determine the reasonableness of the seizure. The test requires consideration of three criteria: (1) the public interest served by the seizure; (2) the degree to which the seizure advances the public interest; and (3) the severity of the intrusion with individual liberty. *Brown,* at 50–51; *Ingersoll,* 743 P.2d at 1304. I concur with this analysis.

On the first part of the test, the majority ignores overwhelming evidence which clearly demonstrates a strong state interest concerning the tragic effects of drunk driving. While taking "judicial notice 'there is no denying the fact that there is a very strong societal interest in dealing effectively with the problem . . .", the majority dismisses the State's interest as an attempt "to weigh the national carnage of drunk driving year round against the minimal intrusion on Seattle drivers for a few seconds each." Majority opinion, at 459. The slaughter and maiming resulting from drunk driving is not simply a national problem; it reaches into every community of this state.

During 1986, the Washington State Patrol reported 658 traffic deaths. Of those investigated, 357 or 54.3 percent

involved a driver under the influence of alcohol. For the same period, drivers under the influence of alcohol were involved in 13,030 investigated accidents. Of those, 6,908 involved injury. These figures do not include drivers who left the scenes of accidents (hit and runs) because they had been drinking. For the 20–year period of 1967 through 1986, the Washington State Patrol reported 14,714 fatal accidents, involving 7,422 drivers under the influence of alcohol. During that same period, 300,756 accidents involved drivers under the influence of alcohol. Of that number, 152,087 injuries resulted from drivers under the influence of alcohol. Washington State Patrol, Accident Records Div., Annual Statistical Report of Motor Vehicle Traffic Accidents (1967–1986).

Under the second criteria, the degree to which the sobriety checkpoint advances the public interest is unquestionable. It is specific and it is identifiable. As noted by the United States Supreme Court in *South Dakota v. Neville,* 459 U.S. 553, 558, 74 L. Ed. 2d 748, 103 S. Ct. 916 (1983):

> The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy.

As to drivers' reasonable expectations of privacy, although "[a]n individual operating . . . an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation", *Delaware v. Prouse, supra* at 662, an individual has a reduced expectation of privacy when operating an automobile on a public highway. *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976). I do not believe a properly instituted and regulated sobriety checkpoint program would violate a motor vehicle driver's legitimate expectations of privacy.

In determining whether a checkpoint program satisfied the balancing test between state interest and individual privacy, I would consider the following factors: (1) The

amount of discretion permitted individual officers at the checkpoint; (2) the checkpoint location; (3) the sufficiency of an advance notice to approaching drivers; (4) the safety of the checkpoint; (5) the notice to the public at large; (6) the amount of time drivers are detained; (7) the thoroughness of the program's guidelines; and (8) the vehicle selection process.

The sobriety checkpoint program implemented by the Seattle Police Department was properly prepared to regulate the conduct of the police officers and constrain their discretion in the field. In forming the program, the City Attorney's Office, city engineers, and Seattle Police Department coordinated their expertise to place the checkpoints at locations statistically prone to DWI arrests and accidents, with traffic safety standards required at their sobriety checkpoints. The procedures used in the sobriety checkpoint program in and of themselves appear to be constitutional. Indeed, the majority does not argue otherwise. The Seattle program fails since it was not authorized by either statute or ordinance in conformance with the requirements of Const. art. 1, § 7. *But cf. Ingersoll v. Palmer, supra* (checkpoint permissible despite absence of specific legislation authorizing roadblock).

## III

The majority's final argument assumes traditional police patrols are less intrusive than a sobriety checkpoint and might "achieve most of the constitutionally permissible benefits sought". Majority opinion, at 459. I do not believe this assumption will withstand analysis. *But cf. State v. Marchand*, 104 Wn.2d 434, 706 P.2d 225 (1985). Not only do I believe roving patrols to be more highly intrusive, they are also far less effective. *See United States v. Brignoni-Ponce, supra.* As one state court succinctly stated:

> There is some authority for the proposition that highly visible patrols assigned to be on watch for erratic types of driving are a more effective means of apprehending drunken drivers . . . and therefore the subjective intrusion on individual rights outweighs the value of a

roadblock. . . . We are not persuaded that roadblocks . . . lose out in the balancing test for this reason. First, the erratic driver may cause injury to himself or others before he is observed by patrols. Second, the ability of a drunk driver to avoid erratic movements along a roadway does not mean he will be able to respond to an emergency where prompt reflexes may be of great importance. (Citations omitted.) *People v. Bartley,* 109 Ill. 2d 273, 286–87, 486 N.E.2d 880 (1985).

The majority states a fairer balance would weigh the actual expected alleviation of the social ill against the cumulated interests invaded. Majority opinion, at 459. If anything, the facts show the traditional patrol method has failed to alleviate the social ill. It is only fortuitous when an officer happens to be in a position to see a drunk driver entering the freeway on the off–ramp before that driver happens to kill some innocent person. *State ex rel. Ekstrom v. Justice Court,* 136 Ariz. 1, 5, 663 P.2d 992 (1983) (Feldman, J., concurring). The publicly announced and well marked checkpoint serves to lessen any fear in the driver and works in conjunction with standard traffic patrol methods for detecting drunk drivers. A driver at night is more apt to fear a roving stop by an officer with reasonable suspicion than a well lit and designated checkpoint area with several other vehicles in line.

I believe a sobriety checkpoint can be constitutionally permissible because of the State's unique governmental interest and the public's concern over the gravity of drunk driving, the effectiveness of checkpoints in deterring and detecting drunk drivers, and the minimal intrusion into the driver's privacy. It is a legislative question as to whether such a program shall be authorized and implemented.

ANDERSEN and DURHAM, JJ., concur with DOLLIVER, J.